I'd like to support Dan Boyd on behalf of the appellants. For short, I'll refer to the appellants at CEH. The appellees are Keane Miller and Stephen Hanneman. CEH was dismissed for lack of personal jurisdiction. This is a case, unlike the other three you've heard today, that never got past the 12B stage. They were dismissed for lack of personal jurisdiction in spite of the fact that Keane Miller and Hanneman were representing Intrepid Drilling and William Simmons, who are Mississippi residents, in connection with matters that are directly related to this case. In the area of personal jurisdiction, as you know, the parlance of that area distinguishes between general jurisdiction and specific jurisdiction. General jurisdiction usually requires a showing of systematic context such that there's enough systematic context so as not to deny due process. And specific jurisdiction arises out of the actual facts of the case. Specific jurisdiction is actually the more powerful of the two when it exists, and that's the general holding of the famous Supreme Court of Helicopteros v. Hall. In this case, we do have specific jurisdiction, but I think we also have general jurisdiction because not only did Miller and Hanneman have this representation of Mississippi clients in this case, but also in two other major cases that Hanneman himself handled that I'll mention later on. And so I think we actually satisfy both. CEH also asserts jurisdiction against the Keane Miller defendants under Mississippi state law. The law of personal jurisdiction under Mississippi state law requires a tort to have been committed in Mississippi. But what tort was it that was committed by Keane Miller? Well, the Keane Miller defendants committed a tort that was in the nature of a gross breach of fiduciary duty by their simultaneous representation of adverse parties, a conflict which I will demonstrate was concealed. The leading case on this is NRA Dresser Industries. It's from the early 90s, but it's been a leading case cited many, many times favorably by this court. In fact, I don't think this case could be affirmed without either overruling or at least disapproving strongly of NRA Dresser Industries, which would be a shame because it's been favorably cited by this court numerous times, including by some members of this panel. Even though Dresser is the landmark decision in this area, the facts of this case are actually even more egregious. In Dresser, Sussman, the disqualified attorney, at least had the decency to notify Dresser and stated that he would facilitate finding a new counsel. Basically, the situation was his firm had a case for Dresser. A new antitrust case became available. He wanted the antitrust case against Dresser, and he said, I'd like to handle this antitrust case, it was a sexy case, I guess, and we'll facilitate your getting new counsel. Well, they didn't agree to it, and so that was why NRA Dresser was filed. They won, and he never was able to file the case, but at least he told them about it. Here, Keen-Miller did not advise CEH of its conflict of interest. Indeed, it concealed it, and this is readily evident if you look at the Hanneman affidavit and the attachments there, too. The Hanneman affidavit, if you look at it on paragraphs 5 through 15 of that affidavit, reflects basically that he admits that he represented CEH, that he was simultaneously representing Intrebit and Simmons. He told CEH that he had some representation of Intrebit on other cases, but he didn't tell them about this case. In other words, he took the position if they didn't specifically ask him about it, he didn't have any obligation to tell them. That was his view of his own ethical obligations. And so I think this is actually a more egregious case than Dresser. Moreover, and another, I guess, alleged distinction is that in Dresser there was a threat to sue, whereas this conflict comes in the transactional arena. But the ABA model rules, which this court has adopted as its primary focus for ethical issues, both in Dresser and in Ray American Airlines . . . In this case, though, different from Dresser, but what is the tort that took place in Mississippi? Breach of fiduciary duty. And how did it happen in Mississippi? I mean the lawyers are in Louisiana. Your clients are out of state, maybe out of country. And I think it was Simmons that's in Mississippi. So where do we have the . . . Well, we've pleaded conspiracy. The whole thing was a conspiracy. And so the acts are imputed to the others. And that provides the nexus to Mississippi. And I just want to mention that the model rules don't make any distinction between whether a conflict arises in the litigation and conflicts in the transaction. What's the basis of your calling it a conspiracy? They were all aware . . . From the record, from the law, from the residents of the various parties. Okay. What makes it a conspiracy? They were all aware of the fact that this was a fraudulent transaction. I'm talking about the representation of the lawyer. How is that a conspiracy? They didn't tell our client about the representation. At the same time, ultimately, Intrepid agreed to pay back the money. There was over $2 million lost in this. Intrepid, at the end, agreed to pay back the money when it did that. And they were in constant communication with Keene Miller. When they agreed to pay back the money, that was an admission that they knew that the transaction was fraudulent. And if they knew it was fraudulent, Keene Miller knew it was fraudulent too because they were in communication with each other. And I'm going to show that there were attorney-client communications between Hanneman and our client during their time of their representation. Hanneman's in Louisiana. Your client's not a Mississippi client, right? Our client is a group of Chinese-based investors. Yeah, but there's no connection to Mississippi. Well, other than the fact that the whole crux of this whole issue involves these Simmons and Intrepid who were in Mississippi, and they were the ones who screwed up the investment. Well, but that still doesn't answer the question of how it's a conspiracy that gives you jurisdiction. Well, we've pleaded conspiracy. As I indicated, it never got past the 12B stage. They were working together. They both knew that the transaction was fraudulent, and I think they're working together. When you have a conspiracy, the acts of one is imputed to the acts of the other, and the acts of Intrepid and Simmons that took place in Mississippi are going to be imputed to Keene Miller and Hanneman. For personal jurisdiction? Yes. What's your best case for that? I don't know that there's a case that says it, but I think it's just common sense under the law of conspiracy that you impute the conduct to all the parties. Bear in mind, on personal jurisdiction, that Hanneman was representing he was in contractual relationships with Simmons and Intrepid in Mississippi, and he was also handling two other major cases for Intrepid in Mississippi. So I think it's really a stretch to say that they don't have personal jurisdiction in Mississippi. I can talk about those two other cases in a minute if I had a chance. Now, the June 21 order that granted the motion to dismiss for lack of personal jurisdiction actually took the position that there hadn't been any communications between any attorney-client communications between CEH and Keene Miller, and the district court was simply wrong about that because there's four specific attorney-client communications between Keene Miller and CEH that are attachments to the Hanneman affidavit, and there was also an in-person meeting between Hanneman and a man named Juris, who is the primary spokesman for CEH that I'll talk about later. The four written ones are attached to the Hanneman affidavit. One is at T179. It's an email from Carson Wong to CEH of Hanneman of Keene Miller, which is an attorney-client communication dated November 23, 2013. T176 is another communication from Wong to Hanneman of Keene Miller. T175 is an email from Hanneman of Keene Miller to Juris Nakiari advising that the so-called conflicts check had been accomplished. And then T173 is another attorney-client communication from Juris to Hanneman. And so the conclusion of the district court in the June 21st order that there hadn't been any attorney-client communications obviously is contradicted by the record. All it was that there had been none in Mississippi. That wasn't the point they were making. They were just making the point in the order that we hadn't proven that there were any at all, and so that's what I was addressing. The point you're making about the Louisiana, I answered that with a conspiracy issue. There was also an in-person meeting in Hanneman's office between Hanneman and Juris and several other people. That happened on January 7, 2015. It was digitally recorded by Juris. This appears on page 23 and 24 of the first amended complaint. This is the first time that Juris realized there was a conflict. One of the people in the meeting was Jim Desnik, who's a Miami investor and his attorney. The fact that there was an attorney present at this meeting is of some significance. When Juris found out about the conflict, he immediately spoke up and challenged Hanneman and said words to the effect, wait a minute, if you're aware of such a clause, and he's talking about a clause that went into the contract that this Jim Desnik client got, why did you not include a clause like that in ours? Weren't you acting as our attorney? At that point, Desnik's lawyer looked at Juris and said words to the effect, Hanneman was representing you? Juris said, yes, it seems to be a conflict of interest. Hanneman replied, no, no, there was not a conflict of interest. Desnik's lawyer looked at Hanneman and said, well, it's a conflict in Chicago, it's a conflict in Illinois, it's a conflict in various places, and Hanneman continued to shake his head and say repeatedly, no, no, no, it's not a conflict because it's a formation of a participation agreement, as if oil and gas participation agreements had a special set of conflict laws that were not applicable to anybody else. Now, is a conflict of interest a tort? Yes, it gives rise to a breach of fiduciary duty. That's a tort. And what was the injury? Lost $2 million. They lost $2 million because of this conflict? Yes. Or because the wells never came out, never produced? Well, they didn't produce, and there has been some comment by Keene Miller that the loss of these two prospects was because of the overall inherent riskiness of oil and gas investments. But the fact that that's belied by the fact that after this meeting that I referred to where the conflict was revealed, Mr. Kettleson, who's sitting over here, one of my colleagues, was hired by CEH, and he fired Keene Miller. And then he then started the process of trying to get Intrepid to pay back the money. Well, they agreed to pay back the money. And in agreeing to pay back the money, I think that they admitted that it was a fraudulent transaction. And since they were in constant contact with Keene Miller, I think Keene Miller also knew it was a fraudulent transaction. So it wasn't because of the inherent riskiness of oil and gas drilling. It was because it was a fraudulent transaction. So are you saying that they never intended to drill or look at the very beginning? Probably not. Is that alleged in your complaint? Yes. I mean, Simmons, I think the record will reflect that he's a man that really can't be trusted with other people's money. He had outstanding against him an over $200 million RICO judgment. This was not revealed to my clients at the time that they recommended Intrepid to my clients. And they didn't reveal that they had two other major pieces of litigation in Mississippi for Intrepid. There were a number of huge concealments. The reason that Kittleson was employed to do a promissory note where Intrepid would pay the money back, but after he looked up their credit rating and found out that they were standing behind an unpaid $200 million RICO judgment and other atrocities like that, he decided there were obviously insolvent and there wasn't any use in preparing the promissory note. But nonetheless, I think the fact that they were willing to pay it back shows that they knew that it was a fraudulent transaction. Now, did the fraudulent transaction occur in Mississippi or in Louisiana? Well, again, I think it's a conspiracy that implicates both states. Well, did Simmons misrepresent anything? Or are you saying the law firm was the one that committed it? The law firm and Simmons were in cahoots, and that's why they even concealed the conflict of interest. The conflict of interest is really at the heart of this thing. And I mentioned that Dresser is the key case on this subject. Dresser wasn't even cited by the opposing party. I don't know what they have to say about Dresser. I guess I'll find out after I sit down, and I'll have five minutes to respond to it. But our position, and again, as I say, it never got past 12b motions, is that they were all in it together, and it was a conspiracy, and the acts of one are imputed to the other, and they happened in both Mississippi and Louisiana. All right. I was trying to allow you to complete your response to Judge Prado, and I think you've done that. Okay. So that said, you have reserved your rebuttal time. So we'll hear now from Mr. Archie. Okay. Good morning, Your Honors. May it please the Court, Colonel Archie here representing King Miller, LLP. Your Honors, I want to begin with the personal jurisdiction, the tort question, and then I'll go to the no loss. And if I can, if I have time, I'll touch on CN2 very quickly. We all agree on what the law is, that they must show a tort that was committed in Mississippi. They have the burden, and only if there's a tort committed in Mississippi. On page 14 of their brief, CEH asked the question, what tort was committed in Mississippi, and then they proceeded to answer that question by stating, quote, the King Miller defendants committed a gross breach of fiduciary duty and professional negligence. That's their answer to the question. Same thing they represented to the Court today. They then cite the Dresser case, Dresser Industries, spend pages and pages on that. Your Honors, the reason why we did not address Dresser Industries is it's not a jurisdiction case. They want to make King Miller look as bad as possible, paint them in a bad light. That's got nothing to do with the jurisdictional issue we're on here today. We will defend King Miller at the appropriate time on these allegations of conflict of interest and what have you, but that's not where we are today. Breach of fiduciary duty and negligence. Any alleged breach of fiduciary duty and alleged negligence would have occurred in the state of Louisiana. Their own allegations, paragraph 17 of the First Amendment complaint, states that Hanneman and King Miller breached their fiduciary duties owed to their plaintiffs by not disclosing to the plaintiffs, and then they list out that litany of things that they came up with. Every one of those is a failure to disclose. That failure to disclose would have occurred at that office in New Orleans. Everything occurred in New Orleans. That's where the representation was. That's where this alleged failure to disclose was. And so the tort, there is no tort in Mississippi. Your Honor, we've cited the Jones-Walker case involving another large law firm. Had some connection here in Louisiana. Had connection in Mississippi. Provided an opinion for the casinos in Mississippi. Addressed to an entity in Mississippi to use to say there would be a valid mortgage. Plaintiff was in Minnesota. It was addressed to an entity in Mississippi. Court held injury did not occur in Mississippi. The plaintiff's principal place of business there was in Minnesota. The opinion letter was drafted in New Orleans. The opinion letter was sent to counsel in Dallas, Texas, and simply because the property, the casino, was in Mississippi did not mean that we had a tort in Mississippi. They have not addressed Jones-Walker and cannot distinguish Jones-Walker. There simply is no tort in Mississippi. Now, conspiracy. Let me address that. First off, that is not in their original brief. They did not argue conspiracy in their original brief. So it's our position that argument is waived, and we have not briefed it because it wasn't there, because they just didn't make that argument. But I'll give the court. Is it in the district court? Yes, Your Honor. There was some argument about conspiracy in the district court. Not on appeal? Not in their original brief. That's correct. It's in their reply brief, but not in the original brief. So we did not have an opportunity to brief that. I want to give the court two quick sites. And Hawkins v. Upjohn is 890 Federal Supplement 601. And, Your Honors, I'll be glad to send a letter in there however you prefer. It's an Eastern District case from Texas in 1994. And then the second case is Clemons, C-L-E-M-O-N-S, v. W-P-R-J-L-L-C. The site for that case is 928 Federal Supplement 2nd, 885. It's a Southern District of Texas case from 2013. Your Honors, Hawkins states that there are numerous problems with plaintiff's contention that if this court has personal jurisdiction over one of the conspirators, it can exercise personal jurisdiction over the co-conspirators as well. Exactly the argument that they're making here. The court goes on and says, First, there is no support in the Fifth Circuit or any other circuit for that matter to support this court exercising personal jurisdiction on this theory. Completely rejected the conspiracy argument that's being presented. The second case is Clemons. There, that court states, and this is 2013, that court states the Fifth Circuit has not recognized this conspiracy theory of personal jurisdiction. And, Your Honors, I would suggest to you if you go down this road, can you imagine the breadth and broadness of this potential jurisdiction? It would completely undermine all of our predicates for personal jurisdiction where an entity has to purposefully avail himself and know he's going to be held in court. Under their theory, if I do business with someone and they happen to be subject to jurisdiction wherever, they can just allege a conspiracy and then I've got to go defend wherever that is. That is certainly not within the parameters of due process in jurisdiction as it is currently in any event. Now, the reference that median that was had that they somehow contend may have conferred jurisdiction, that median was in Dallas, Texas. There was no median in Mississippi. There was no work done in Mississippi. Every bit of it was done here. And the work was fairly limited, by the way. It was just a review of participation agreement. Was it a review or a preparation? It was provided by the other party, and CEH asked Mr. Hanneman to comment on it, mark it up, provide revisions, what have you. That's all it was, Judge. But Keene Miller had not prepared the original? Had not. That is correct. And Mr. Fritch is going to make sure I've got the facts straight as Mr. Hanneman, but that's correct. Your Honor, the Jones-Walker case in the Fifth Circuit jurisprudence is the bare existence of an attorney-client relationship is not sufficient to confer jurisdiction. Cases where an attorney represents someone from another state, that is not sufficient for a suit to be filed in another state. The Ainsworth case, you've got a Louisiana lawyer joins with a Mississippi lawyer, and then when they have a dispute over the fees, the Mississippi lawyer sues the Louisiana lawyer in Mississippi, and the court says no, there's no jurisdiction there. That should be over in Louisiana, which is where this should have been. And so where the only connection in that case, you had a Louisiana lawyer entered into a contract with a Mississippi lawyer, and they performed the work, no jurisdiction. So there's simply no jurisdiction here. Contracting with a resident of a form of state does not establish minimum contacts. The Baker v. McKenzie case has a nice comment that I hadn't picked up on until I was studying. It says the contacts must be between the defendant and the form state, not simply between the defendant and a resident of the form. So there are no contacts here between Kim Miller and Mississippi. Thank you. Your Honor, the fact is that there just is no jurisdiction. The suggestion that there could be any general jurisdiction is just completely belied by the facts. No business in Mississippi. The law firm and the partner reside and practice law in Louisiana. They own no property in Mississippi. They pay no taxes in Mississippi. They don't do business there. They don't advertise there. You've got a couple of ad hoc cases. Courts have made clear that that's not sufficient for personal or general jurisdiction. And there's nothing to suggest that Kim Miller is essentially at home, is the term used, the court used, in Mississippi so as to be subject to general jurisdiction. In conclusion, Kim Miller has no systematic or continuous contacts in Mississippi, did nothing to purposely direct his business activity into Mississippi, and could be expected to be held in the court in Mississippi. Now, that leaves us with the next level, which is securities law. And can they get jurisdiction, nationwide jurisdiction, under the securities law? In Section 27 of the Private Securities Litigation Reform Act. And, Your Honor, there are six elements, obviously, to a securities claim. No-loss causation is the one that we're on here today. The plaintiff has the burden of proving that the act caused the loss that the plaintiff is seeking to recover. But-for is not enough. They are arguing but-for, and they're arguing it strenuously, but that's all they're arguing is a but-for. There must be some direct causal relationship between the misrepresentation or omission and the actual loss. Not a but-for, but you've got to have some relationship. CEH alleged that the well failed due to a well event. That's not anything to do with Key Miller. It was a well event. A well was drilled, and they had an event, and it failed. That happens every day in the oil and gas industry. Got nothing to do with Key Miller. That's not loss causation. The second well was never drilled, and the funds were allegedly converted. That's between CEH and Intrepid. Nothing to do with Key Miller. Certainly nothing to do with their representation. At no point did-in the First Amendment complaint does CEH assert that omissions or representations of Key Miller caused their financial losses. They rely upon the Livins-Holdings case, but that doesn't get anywhere. Livins-Holdings found that the representations in that case were causally related to the loss it sustained. They try to argue that because this is a private security that that's somehow different. Their cases still require loss causation. The private security dichotomy or point that's being made has to do with fraud on the market. That's not what this case is about. They rely upon Bailey v. Buck. They like Bailey v. Buck a lot because it has-in the facts of that case, you've got a judgment that wasn't disclosed, one of the things that they can complain about here that Mr. Hanneman did not know about, by the way. But in Bailey, there was also another misrepresentation, which is that the stock could not be transferred because there were other claimants to it. Well, that's loss causation right there. There is a misrepresentation that goes directly to their loss that was not disclosed that they're complaining of. That establishes loss causation. The failure to disclose the judgment didn't. We don't have loss causation here. The cause of the loss was the well event and the conversion, not these representations. Your Honor, the final point I'll touch on is Sienter. The district court did not address Sienter, but it is so plain to me that it is appropriate that I'd like to address that with the court very briefly. The court can affirm based on what's in the record and what was argued below as long as we've raised it, which we've done. There is a heightened pleading requirement under the Private Securities Litigation Reform Act for Sienter. The plaintiff must demonstrate the allegations as a whole created a powerful and cogent inference by a reasonable person that Sienter was involved. They must also, that inference of Sienter must be at least as strong as any non-fraudulent inference. General conclusory allegations and general allegations and conclusory statements are not sufficient. The Fifth Circuit has ruled that. In this case, the only allegation is that defendants, not even specific to King-Miller, defendants acted with Sienter, period. That's paragraph 203 of the amended complaint. Woefully insufficient. There is nothing there. Indiana Electric Workers is a case, a Fifth Circuit case that says that's insufficient. General conclusory allegations. There was no Sienter. In fact, their own allegations are that Mr. Haneman wanted the relationship with CEH to flourish. Well, that's exactly the opposite of Sienter. That refutes their allegation of Sienter. As to the specific facts, we've got the evidence affidavits that were submitted. Mr. Haneman disclosed his representations. That refutes Sienter. He disclosed what he stated what he thought of the other matters. There was one small lawsuit that was being brought that he was defending and said no merit to it. That's not Sienter, and that's actually turned out to be correct. The other was one where he was recovering some money from an insurance company. He said that had nothing to do with this. No Sienter. So he made these disclosures. There is no Sienter. There is noótheir general representation of Sienter is certainly not sufficient to get them there. Your Honor, this case begins with the tort. What is it? The only thing they've said is breach of fiduciary duty. To the extent thatóand their own allegations are that breach is by failing to disclose. That's right here in New Orleans. There is no tort in Mississippi. Then you go to loss causation. Loss causation is not present because their own allegations are it was a well event. So no personal jurisdiction. The district court was correct. We're a Louisiana lawyer who performed work in Louisiana for Louisiana oil wells for an out-of-state or out-of-country plaintiff. This suit should have been brought in Louisiana, not Mississippi, Your Honor. So if you have no more questions of me, I will stop at this point. Thank you, Mr. Archam. Mr. Fritchie? Hold on, Mr. Boyd. Mr. Fritchie has time. Mr. Fritchie has his time. Hey, police court. Gus Fritchie on behalf of Stephen Hanneman. I have nothing to add to what Mr. Archie addedósaidóunless you have any specific questions relative to Mr. Hanneman.  Thank you. Thank you, sir. All right. Now, Mr. Boyd. Yes. Keene Miller was all over Mississippi. In addition to this matter, they alsoóKeene Miller through Hanneman himselfórepresented Intrepid in a suit against Lexington Insurance regarding a well event, and this fact was also withheld. It's part of ouróthe basis of our fraud. Keene Miller represented Intrepid and Simmons in defense of an oil and gas investor fraud suit in Mississippi by Mr. Parker. That was also withheld from us. Their website at the time said that they do litigation all over the Gulf Coast, so they have a lot of contacts with Mississippi. We disagree with the fact that Hanneman only reviewed the participation agreement. We state in paragraph 107 of the First Amendment complaint that Stephen Hanneman prepared and emailed a subscription agreement and participation agreement to our client. The case cries out for a trial because, obviously, there's a difference of opinion about that, but we never got past the stage of 12B motions. So they're all over Mississippi. We did plead conspiracy. And although the first brief may not have actually mentioned the word conspiracy, you can't read my first brief without coming to the conclusion that we are alleging a general, overall concerted action by Intrepid and Simmons on the one handó Oh, no, no, no, Mr. Boyd. That won't do it. You say on page 32 of your brief, the district court also failed to address the fact that plaintiffs have pled other causes of action. Plaintiffs have included a strict liability claim for Intrepid and Simmons. Plaintiffs have accordingly claimed conversion and breach of fiduciary duty by way of misapplication of fiduciary funds. And then you go on to talk about it being a garden, et cetera, et cetera. It's page 4 of your reply brief where you say CEH has pleaded conspiracy to breach fiduciary duty. So I reread the briefs. I don't see conspiracy raised other than in your reply brief as counsel opposite has said. Ordinarily, we say then you've waived it. So I'm not following you that in the general thrust of allegations you made initially that somehow we should determine that conspiracy was raised in appeal. All right. Let me speak to loss causation briefly. He mentioned Bailey v. Buck, which was my case, actually. You waived the conspiracy argument? No, I don't. Why not? Because I do think that the brief as a whole, when read as a whole, asserts. That's not the rule, Mr. Boyd. That's not the rule read as a whole. The rule is you raise points on your main brief on appeal. And if you raise it for the first time in a reply brief, it's waived. So do you agree or disagree that conspiracy is not raised in the initial brief? Well, the word conspiracy was not used in the original. All right. All right. About loss causation, Bailey v. Buck had two nondisclosures. One was a prior judgment, and one was that Buck had entered into an instrument that possibly had the ability to keep the investors from being able to sell their interests. Those were the only omissions. The omissions in this case include omitting to tell the $205 million RICO judgment, omitting to tell about the two major lawsuits that they had in Mississippi, various other omissions that we've listed in the brief. Actually, Bailey v. Buck, properly understood on loss causation, shows that there is loss causation here, and this is a much stronger case for loss causation than Bailey v. Buck was. Thank you, Your Honor. All right. Thank you. Thank you, counsel, both sides, for your briefing and argument. The case will be submitted along with the other cases heard today and the one on no argument. This panel will stand in recess until 9 a.m. tomorrow.